IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2001 Session

## STATE OF TENNESSEE v. GALEN DEAN EIDSON

**Direct Appeal from the Criminal Court for Sumner County**
**No. 965-1999     Jane Wheatcraft, Judge**

---

**No. M2000-02390-CCA-R3-CD - Filed August 16, 2001**

---

The Appellant, Galen Dean Eidson, was indicted by a Sumner County Grand Jury for second degree murder. Pursuant to the terms of a plea agreement, Eidson pled guilty to the reduced offense of reckless homicide.[1] Following a sentencing hearing, the trial court sentenced Eidson to four years confinement in the Department of Correction. On appeal, Eidson raises the following sentencing issues for our review: (1) Whether the length of the sentence imposed by the trial court was excessive; and (2) whether the trial court erred in sentencing him to total confinement in the Department of Correction. Upon *de novo* review, we find that a total confinement sentence of four years is justified in this case. Accordingly, the judgment of the Sumner County Criminal Court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J. and L. T. LAFFERTY, SR. J., joined.

Richard McGee and Wendy S. Tucker, Nashville, Tennessee, for the Appellant, Galen Dean Eidson.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Patricia C. Kussmann, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1]The terms of the plea agreement further provided that in addition to reducing the homicide from a class A felony to a class D felony, a second count of "abuse of a corpse" would be dismissed.

## OPINION

## Factual Background

In 1999, the twenty-six-year-old Appellant worked on the family farm near Portland in Sumner County. The farm is owned by the Appellant's parents; however, the Appellant is a partner in the farming operation. Tobacco is the principle agricultural crop. Although the Appellant worked in the fields, he also supervised the farm workers, which included immigrant laborers. At approximately 5:30 p.m. on October 8, 1999, the Appellant was transporting three Hispanic farm workers in his truck over a field road on the family farm when the truck overturned.[2] It had begun to rain that afternoon and continued to rain throughout the night. The site at which the accident occurred involved an up-hill grade. The Appellant swerved to miss some deer, overturning the truck and pinning the victim, Emilio Almaraz Monjaraz, underneath the vehicle.

All three passengers were illegal immigrants. According to the Appellant, the other two passengers told him "no police, no problems" just before leaving the scene on foot. The Appellant used his cell phone to call his best friend, Timmy Jenkins. The Appellant told Jenkins that "he had some problems out on the farm" and requested that he bring him a chain. Jenkins agreed and later he and his wife, Melissa Jenkins, met the Appellant on a paved road at the bottom of a hill near the farm. Upon arriving, the Appellant told Jenkins, "I got to go home first. My battery is going dead on my phone. I need to call Nikki [the Appellant's wife] and tell her what's going on." Jenkins then took the Appellant back to his [Jenkins] house where the Appellant phoned his wife.

Jenkins and the Appellant decided to go back to the truck. However, Jenkins's wife chose not to go because it was too cold. On the way to his truck, the Appellant first explained to Jenkins that three farm workers were riding with him when he swerved to miss three cows and overturned the truck.[3] As they were approaching the vehicle, however, the Appellant told Jenkins, "I have a problem, and I have totaled the truck. I flipped it upside down. I have a dead Mexican on my hands." Jenkins first thought the Appellant was joking. The Appellant then told Jenkins to turn his headlights off because "he didn't want anybody to call the law."

The Appellant asked Jenkins to help him upright the truck so they could take it to the bottom of the hill and hide it in the shed. Jenkins refused to help. The Appellant then grabbed the chain from the back of Jenkins's truck and "attached it to the truck and the tractor that was already backed up to the truck before [Jenkins] got there." The Appellant got on the tractor, started it, and pulled the truck upright. The Appellant told Jenkins to shine his flashlight toward "the Mexican" so he could check on the body. Jenkins complied. The Appellant then began discussing various ideas of

---

[2] During questioning by Trooper Carter, the Appellant stated that the accident took place during daylight hours, sometime between 5:00 and 5:30 p.m. and that it was not yet raining or "had just begun to rain" at the time the accident occurred.

[3] The Appellant's version to Trooper Carter was slightly different. He told Carter that he was driving too fast and swerved to miss some deer.

how to get rid of "the body" and decided that he was not going to call police because he had previously "filed bankruptcy. . .[and didn't want] to lose [his truck]." The Appellant also stated that he did not want anyone to know that the accident had occurred on his parents' land.

After some discussion about what he should do next, the Appellant reached down, grabbed the victim's ankles and started dragging him. He proceeded to drag the body approximately 300 yards towards a hog waste lagoon surrounded by dense woods. During the dragging, the victim's shirt was torn off when the victim became ensnared on a fence. The Appellant dislodged the victim and proceeded into the wooden area. Jenkins heard a "big splash" before the Appellant yelled, "He's floating. What should I do?" Because the body was still floating, the Appellant asked Jenkins for a gun so he could shoot holes in the body to make it sink. Neither the Appellant nor Jenkins had a gun and Jenkins "didn't think [they] should shoot it so it would sink better." Jenkins then asked the Appellant if he saw a stick anywhere. Jenkins heard the Appellant break off a tree branch, which the Appellant used to push the victim's body under the water so that it would not float to the surface. Several minutes later the Appellant emerged from the woods.

The Appellant asked Jenkins if he would help him clean up the debris from the truck. Jenkins refused, telling him that it was late and that he had to get up early for work. The Appellant gave up and said that he would come back to clean things up in the morning before his father arrived to hang tobacco. Jenkins returned the Appellant to the Appellant's house around 9:15 p.m. Sometime that night, the Appellant's wife left a message with the insurance company about the wrecked truck. The Appellant's wife testified that the Appellant never mentioned anything about the victim or his death that night, but only mentioned that he had wrecked his truck.

By 12:30 a.m., the two other Hispanic farm workers, who spoke no English, had contacted a Spanish interpreter and the three proceeded to the Portland City Police Department to report the accident. After advising Officer Kevin Williams of the incident, the three returned with the officer to the scene to assist in locating the overturned truck. Trooper Robert Carter of the Tennessee Highway Patrol also overheard the call and followed Officer Williams as they returned to search for the truck. Approximately an hour later, at approximately 1:30 a.m., the "heavily damaged" truck was located on the Eidson farm in an upright position. Although debris from the truck was scattered over the ground, no body was found at the scene.

Once the dispatcher identified the license plate as belonging to the Appellant, the Appellant, his mother and brother were notified and asked to come to the scene. After being *Mirandized* by Trooper Carter, the Appellant explained that he had been driving, had wrecked his vehicle, and after being knocked unconscious, awoke to find that the three men riding with him "had done gone." The Appellant stated that he "guess[ed] they hit the road running." He related that he used his cell phone to call Jenkins who came and picked him up and took him home. The Appellant further explained that he and his father-in-law had returned to the scene later that night and turned the truck upright so that he [the Appellant] could retrieve some important papers. He stated that he did not call the police because it was on private property and thought no one had been hurt. The Appellant agreed to accompany the officers back to the sheriff's department for further questioning.

At approximately 7:00 a.m., Detective Carl Edison, of the Sumner County Sheriff's Department, interviewed the Appellant and received a substantially similar story to the one the Appellant gave Trooper Carter at the scene. During a second interview later that morning, the Appellant again told Detective Edison that he was knocked unconscious and awoke to find no one present.

After the interviews with the Appellant, Detective Edison interviewed Jenkins for a second time. Although Jenkins initially denied any knowledge of the victim's death, he eventually told Detective Edison about the events of the previous night and disclosed the location of the body. Detective Edison then interviewed the Appellant a third time and told him "he knew there was a dead Mexican on his property." The Appellant started crying and asked for a lawyer. Detective Edison ceased the interview.

As a result of the interview with Jenkins, Emergency Management was dispatched at noon to the lagoon to search for the victim's body. After two attempts, and through the use of grappling hooks, the victim's body was retrieved from the lagoon. The victim was found without a shirt. A search of the area immediately surrounding the lagoon revealed "questionable impressions or bent vegetation." Officers believed these marks suggested the particular path taken by the Appellant as he drug the victim's body through the woods to the lagoon. No "drag marks," however, were found in the surrounding fields.

Approximately nine days later, the Appellant paged Jenkins and asked that he call him. Jenkins first called Detective Edison, however, and told him about the Appellant's message. Detective Edison placed a recording device on Jenkins's telephone before Jenkins answered the Appellant's page. When Jenkins called the Appellant, the Appellant stated, "Everything [is] under control and [don't] talk to the police; [I] have a lawyer and everything [is] under control; [I] have it taken care of, just stick to the original story."

Dr. Charles Harlan, a forensic pathologist, performed an autopsy on the victim and determined that "the cause of death was drowning." Dr. Harlan further noted that the victim had other injuries "consistent with trauma such as you might see in a motor vehicle accident." However, Dr. Harlan testified that the injuries sustained during the wreck were neither "life threatening or life terminating injuries" and that "the injuries from the truck accident itself were insufficient to cause death." On cross-examination, defense counsel asked Dr. Harlan if it was possible for the victim to have "drowned" while pinned under the truck if he had been pinned face down. Dr. Harlan replied that it "is possible if a pool of water was there."

# ANALYSIS

## I. Whether Sentence Imposed was Excessive

The Appellant argues that the four-year sentence imposed by the trial court was excessive based upon the misapplication of enhancing factors and the failure to apply relevant mitigating factors. When an accused challenges the length, range, or the manner of service of a sentence, this Court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Furthermore, when conducting a *de novo* review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, 103, 210.

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, where the trial court fails to comply with the statutory provisions of sentencing, appellate review is *de novo* without a presumption of correctness. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000)(citing State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). Furthermore, we emphasize that facts relevant to sentencing must be established by a preponderance of the evidence and not beyond a reasonable doubt. Id.

In the present case, the Appellant pled guilty, as a range I offender, to the offense of reckless homicide, a class D felony. Tenn. Code Ann. § 39-13-215. The sentencing range for a class D felony is "not less than two (2) nor more than four (4) years." Tenn. Code Ann. § 40-35-112(a)(4). The presumptive sentence for a class D felony "shall be the minimum sentence in the range if there are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-210(c). Where enhancement factors are present, but no mitigating factors, "then the court may set the sentence above the minimum in that range but still within the range." Tenn. Code Ann. § 40-35-210(d). Where there are both enhancing and mitigating factors present, "the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e).

## A. Enhancement Factors

Upon *de novo* review, we first address the Appellant's argument that the trial court erred by applying three enhancement factors during sentencing. When imposing the sentence, the trial court found no applicable mitigating factors and apparently[4] applied the following three enhancement factors found in Tenn. Code Ann. § 40-35-114:

> (1)     The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

> (5)     The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and

> (15)   The defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense.

The Appellant first contends that the application of enhancement factor (1) was inappropriate to establish prior criminal conduct and, thus, improperly considered by the trial court. The Appellant had previously pled guilty to reckless driving and leaving the scene of an accident.[5] Although it is not entirely clear from the record that the trial court applied enhancement factor (1), we find the Appellant's previous convictions of reckless driving and leaving the scene of an accident applicable in this case. Additionally, we note that the Appellant was arrested for assault in 1997, placed on probation, with his record later being expunged. The testimony and evidence of the criminal acts preceding the arrest are admissible as evidence of prior bad acts or evidence of social history even if expungement is later obtained. State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). Thus, all three criminal convictions may properly be considered as applicable under enhancement factor (1).

Second, the Appellant contends that the trial court erred by applying enhancement factor (5). Specifically, he argues that because the Appellant thought the victim was dead when he removed his body from underneath the truck and placed it in the lagoon, that his actions did not constitute exceptional cruelty. We disagree.

---

[4]The evidence in the record is somewhat contradictory with respect to whether the Appellant's prior criminal history was considered as an enhancement factor pursuant to Tenn. Code Ann. § 40-35-114(1). During the sentencing hearing, the trial court stated, "I don't think that the case law of this state is such that I can use the leaving a scene of an accident of a property damage accident as an enhancing factor. I am considering that because it shows me that there is a tendency to avoid responsibility." Later, in its order denying bond, the trial court indicated that it had, in fact, applied this enhancement factor.

[5]On October 24, 1997, the Appellant hit a tile culvert and mailbox and immediately left the scene. The property owner found the Appellant at another location changing the tire "he had busted" when he hit the tile culvert and mailbox. The property owner brought the Appellant back to the property where the mailbox was damaged and called police. Officer Dewel Scruggs testified that the Appellant had been drinking, but was not charged with DUI "because he was not impaired."

With respect to enhancement factor (5), we initially acknowledge that our supreme court has determined that proof of serious bodily injury does not necessarily establish the enhancement factor of "exceptional cruelty." State v. Poole, 945 S.W.2d at 98. Instead, our supreme court has found that before this factor may be applied, the facts of the case must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' " the crime. Id. Nonetheless, our courts have upheld the application of exceptional cruelty based upon proof of extensive physical abuse. State v. Arnett, No. E1998-00051-SC-R11-CD (Tenn. at Knoxville, July 3, 2001), *not yet released for publication.* When the trial court applies enhancement factor (5), it should state what actions of the defendant, apart from the elements of the offense, constituted exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45 (Tenn. Crim. App.1995). Although the trial court in this case did not articulate its reasons for finding exceptional cruelty, we nonetheless conclude that the record is more than adequate to show that this enhancement factor applies to the Appellant.

The plain language of the statutory enhancing factor requires that the victim "be treated with exceptional cruelty <u>during the commission of the offense</u>." Tenn. Code Ann. § 40-35-15(5). (emphasis added). Despite the Appellant's assertions that the victim drowned while under the truck, the guilty plea hearing foreclosed any issue as to when the victim's death occurred.[6] During the prosecutor's recital of the facts supporting the guilty plea, the Appellant agreed to the statement that ". . . the autopsy by Dr. Harlan ruled that [the victim] died from drowning after he was thrown in the pig pond." Thus, the Appellant's ongoing treatment of the victim from the time the victim was pinned under the truck to the time the victim was thrown in the lagoon occurred "during the commission of the offense." Instead of seeking medical assistance, the Appellant left the victim under the truck until his friend arrived with a chain. Once he uprighted the truck, the Appellant drug the victim's unconscious body three hundred yards across tobacco fields. The victim was ensnared on a fence during this dragging process. He then proceeded to drag the victim through dense woods

---

[6] The only mention of the theory that the victim drowned at the accident site was presented by defense counsel in a hypothetical question:

| Defense Counsel: | And it occurred to me, Dr. Harlan, there is another theory you and I had not discussed, and that is that the deceased, as a result of the car accident, was unconscious and face down under the truck. That is consistent with the injuries that you saw, true? |
| Dr. Harlan: | Correct. |

| Defense Counsel: | And that a rainstorm deposited water, and due to the man's unconsciousness and the fact that he was face down, he drowned? |
| Dr. Harlan: | That is possible if a pool of water was there. |

No proof was ever introduced by the defense to support this hypothesis.

until he reached the "pig pond" or lagoon. He threw the victim into the lagoon and, upon realizing that he was floating, asked for a gun so he could shoot holes in the body to make it sink. When no gun was available, he broke off a tree branch and poked the body repeatedly until it stayed under water. Certainly, the facts of this case are sufficient to be considered exceptionally cruel as they represent a culpability distinct from and appreciably greater than that incident to the offense.

Finally, the Appellant argues that enhancement factor (15) was also improperly applied by the trial court. Specifically, the Appellant argues that no trust relationship existed that made the victim particularly vulnerable to him. He further asserts that even if there was a trust relationship, the victim's death was not caused through an abuse of that trust.

> In finding that enhancement factor (15) was applicable, the trial court reasoned as follows: The defendant abused a position of public or private trust, I think is applicable. He was the employer of these people. They came to work on his farm, and I think that they have a right to trust him and to trust that, having had an accident, that he would do something to care for them.

The application of enhancement factor (15), that the defendant abused a position of public or private trust, requires a finding, first, that the defendant occupied a position of trust vis-a-vis the victim and, second, that the defendant abused that position in a manner that significantly facilitated the commission of the offense. *See* State v. Kissinger, 922 S.W.2d 482, 488 (Tenn.1996).

In State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999), our supreme court discussed the application of the private trust factor as follows:

> As stated in State v. Kissinger, to determine the application of the private trust factor, the court must look to "the nature of the relationship," and whether that relationship "promoted confidence, reliability, or faith." State v. Kissinger, 922 S.W.2d at 488. It is the exploitation of this vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor. Accordingly, factor (15) is construed to apply only where there is evidence that the nature of the relationship between the perpetrator and the adult victim caused the victim to be particularly vulnerable. If such a relationship or "private trust" is shown, the State must then prove that the perpetrator abused that relationship in committing the crime. As with all determinations regarding the application of an enhancement factor, the utilization of this analysis "is a task that must be undertaken on a case-by-case basis." Poole, 945 S.W.2d at 96.

Although a private trust may have existed between the Appellant and the victim by virtue of a supervisor/employee relationship, we are unable to conclude that the Appellant abused this position of trust in a manner that significantly facilitated the commission of the offense. Accordingly, we find the trial court improperly applied enhancement factor (15).

## B. Mitigating Factors

The Appellant next argues that the trial court erred by not applying the following mitigating factors, pursuant to Tenn. Code Ann. § 40-35-113, during sentencing:

(3)   Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(11)  The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and

(13)  Any other factor consistent with the purposes of this chapter, [*i.e.*, (1) no prior record, (2) model citizen and (3) remorse for his conduct.].

With respect to mitigating factors (3) and (11), the Appellant argues that the overturning of his truck was an "unintentional act" and that the Appellant "had no intention of causing the death of [the victim]." We first note that the Appellant's argument is misplaced as it focuses upon the vehicular accident rather than the Appellant's conduct which resulted in the victim's death. Moreover, the offense of reckless homicide does not require an intentional act. According, we find that no grounds exist to excuse or justify the Appellant's conduct. Furthermore, we find that the Appellant's criminal conduct, which resulted in the drowning of the victim, was motivated by monetary reasons and concealment of the factual events of the accident.

Finally, the Appellant argues that, pursuant to mitigating factor (13), the trial court erred by refusing to consider "that he has no prior record, and that he has been a model member of his family, his community and church." He further argues that his "remorse" should have also been considered as mitigating evidence. As discussed previously, the Appellant does, in fact, have a criminal record. Further, despite the Appellant's claims that he was a model citizen, the evidence in the record indicates otherwise. At the time of the accident, the Appellant related to Jenkins that he previously drank one beer and was splitting a twelve-pack of beer with the three passengers.[7] Further testimony revealed that the Appellant had a severe drinking problem during the past two to three years and Jenkins testified that the Appellant had a "violent history." We find the trial court properly declined to consider the Appellant's alleged status as a "model citizen" in the community as mitigating evidence under factor (13).

Lastly, with respect to the Appellant's expressions of remorse, "genuine, sincere remorse is a proper mitigating factor." State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995)(citing State v. Buttrey, 756 S.W.2d 718, 722 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.1988)).

---

[7]Trooper Carter testified that during his initial questioning of the Appellant, which occurred approximately nine hours after the wreck, he observed nothing which would have led him to believe that the Appellant had been consuming alcohol. Officers did find empty beer containers at the scene.

However, "the mere speaking of remorseful words or a genuflection in the direction of remorse will not earn an accused a sentence reduction." Williamson, 919 S.W.2d at 83. The finding of the presence or absence of remorse, similar to assessing the credibility of a witness, is best left for determination by the trial court. In determining whether actual remorse is present, the reviewing court may consider the Appellant's conduct and statements immediately following the unlawful act, any underlying motivation for the expression of remorse and the Appellant's statements at the sentencing hearing. In this case, the Appellant did not testify at the sentencing hearing. The trial court concluded that the Appellant's expressions of remorse for his conduct were not genuine, stating that it "didn't see any sign of remorse." We are unable to conclude that the record preponderates against this finding.

In sum, following a *de novo* review, we find the presence of two enhancement factors, Tenn. Code Ann. §§ 40-35-114(1)&(5), and find no mitigating factors applicable. As such, we conclude that the sentence of four years is justified in this case.

## II. Total Confinement

The Appellant asserts that the trial court erred by ordering him to serve his four-year sentence in total confinement. He contends that the trial court should have placed him on probation or, in the alternative, sentenced him to a term of split-confinement. At the time of his arrest, the Appellant was married with three young children, and had previously attended two and one-half years of college before quitting.

Because the Appellant was convicted of a class D felony, he is entitled to the presumption that he is a favorable candidate for alternative sentencing. *See* TENN. CODE ANN. § 40-35-102(6). We note, however, that "the determination of whether the Appellant is entitled to an alternative sentence and whether the Appellant is entitled to full probation are different inquires." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Where a defendant is entitled to the statutory presumption of alternative sentencing, the State has the burden of overcoming the presumption with evidence to the contrary. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), *overruled on other grounds*. "Conversely, the defendant has the burden of establishing [his] suitability for total probation, even if the Appellant is entitled to the statutory presumption of alternative sentencing." Id.; Boggs, 932 S.W.2d at 477.

### A. Total Probation

To meet the burden of establishing suitability for total probation, the defendant must demonstrate that probation will "subserve the ends of justice and the best interest of both the public and the defendant." Id. at 456. The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for probation: (1) "the nature and [circumstances] of the criminal conduct involved", Tenn. Code Ann. § 40-35-210(b)(4); (2) the defendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation the defendant will commit another crime, Tenn. Code Ann. §

-10-

40-35-103(5); (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense, Tenn. Code Ann. § 40-35-103(1)(B); and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes, Tenn. Code Ann. § 40-35-103(1)(B). Denial of probation may be based solely upon the circumstances of the offense when they are of such a nature as to outweigh all other factors favoring probation. State v. Bingham, 910 S.W.2d at 456, *overruled on other grounds*; State v. Fletcher, 805 S.W.2d at 788-89.

Upon *de novo* review, we find the facts and circumstances of this case to be clearly aggravated. The record reveals a callous indifference by the Appellant toward the victim and shows the calculated nature of the Appellant's actions. The Appellant further sought the help of a friend to cover up the crime and continued to mislead police concerning the events surrounding the incident. Lack of candor and credibility are indications of a defendant's potential for rehabilitation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn.1983); State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). The trial court found that the Appellant was not amenable to rehabilitation because he "had persisted in the cover-up of this horrible crime." We agree and find that the circumstances of the offense are of such a nature as to outweigh all factors favoring probation.

### B. Alternative Sentencing

The Appellant next argues that the trial court erred by not granting him a sentence of split-confinement. When imposing a sentence of total confinement, the trial court should base its decision on the considerations listed in Tenn. Code Ann. § 40-35-103(1):

(A)     Confinement is necessary to protect society by restraining a defendant
        who has a long history of criminal conduct;

(B)      Confinement is necessary to avoid depreciating the seriousness of the offense
        or confinement is particularly suited to provide an effective deterrence to
        others likely to commit similar offenses; or

(C)     Measures less restrictive than confinement have frequently or recently
        been applied unsuccessfully to the defendant.

Upon *de novo* review, we first note that neither (A) nor (C) apply in the present case. The Appellant does not have a long history of criminal conduct nor have measures less restrictive than confinement been previously applied to the Appellant. We further acknowledge that confinement would not provide an effective deterrence to others likely to commit similar offenses. *See* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Accordingly, our inquiry must be whether confinement is necessary to avoid depreciating the seriousness of the offense.

In order to deny an alternative sentence based upon the seriousness of the offense, the circumstances of the offense "as committed, must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the

offense must outweigh all factors favoring probation." State v. Bingham, 910 S.W.2d at 454, *overruled on other grounds*, (citing State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App.1991)).   After review, we find the facts of this case to be particularly reprehensible, offensive and shocking.  Despite the fact that the Appellant had a cell phone with him, he made no effort to seek medical attention for the victim.  Instead, the Appellant used the phone to call his friend to assist in the concealment of his actions.  The Appellant also called his wife to inquire about insurance on the truck.  Several hours after the accident, the Appellant proceeded to drag the unconscious victim 300 yards to a nearby lagoon.  Because the body was floating, the Appellant broke off a tree branch and "pushed" the body under the surface of the water until it sank.  Four hours later the Appellant returned home.  Despite repeated questioning from the police that night and throughout the next day, the Appellant denied any knowledge of the victim's whereabouts or any knowledge that anyone had been injured at the scene on that particular night.  Nine days later, the Appellant was still attempting to interfere with the investigation by admonishing his friend, ". . .  don't talk to the police . . . just stick to the original story."

We find that the facts surrounding this case are so reprehensible and offensive that the nature of the offense outweighs any and all factors favoring a sentence other than confinement.

## CONCLUSION

After *de novo* review, we find the four-year sentence imposed by the trial court to be appropriate.  We also find that total confinement is necessary to avoid depreciating the seriousness of the offense.  Accordingly, the judgment of the Sumner County Criminal Court is affirmed.

_____
DAVID G. HAYES, JUDGE